# IN THE COURT OF CHANCERY OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| ANCHORAGE POLICE & FIRE RETIREMENT SYSTEM and TEAMSTERS UNION NO. 142 PENSION FUND, on behalf of themselves and all other former stockholders of Focus Financial Partners Inc., <br><br> Plaintiffs, <br><br> v. <br><br> RUDY ADOLF, RAJINI KODIALAM, JAMES D. CAREY, FAYEZ S. MUHTADIE, STONE POINT CAPITAL LLC, TRIDENT FFP L.P., TRIDENT VI, L.P., TRIDENT VI PARALLEL FUND, L.P., TRIDENT VI DE PARALLEL FUND, L.P., GOLDMAN SACHS & CO. LLC, CLAYTON, DUBILIER & RICE, LLC, FERDINAND FFP ACQUISITIONS, LLC, FERDINAND FFP MERGER SUB 1, INC., and FERDINAND FFP MERGER SUB 2, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | C.A. No. 2024-0354-KSJM |

## MEMORANDUM OPINION

Date Submitted: October 23, 2024
Date Decided: April 3, 2025

Derrick B. Farrell, Matthew L. Miller, Robert B. Lackey, BLEICHMAR FONTI & AULD LLP, Wilmington, Delaware; Christine M. Mackintosh, Vivek Upadhya, Casimir O. Szustak, GRANT & EISENHOFER P.A., Wilmington, Delaware; Javier Bleichmar, BLEICHMAR FONTI & AULD LLP, New York, New York; *Counsel for Plaintiff Anchorage Police & Fire Retirement System*.

Ned C. Weinberger, Michael C. Wagner, LABATON KELLER SUCHAROW LLP, Wilmington, Delaware; Craig J. Springer, ANDREWS & SPRINGER LLC, Wilmington, Delaware; Domenico Minerva, John Vielandi, LABATON KELLER SUCHAROW LLP, New York, New York; Eric L. Zagar, Cameron N. Campbell, Lauren C. Lummus, KESSLER TOPAZ MELTZER & CHECK, LLP, Radnor, Pennsylvania; Jeremy S. Friedman, David Tejtel, Christopher M. Windover, David

A. Rosenfeld, FRIEDMAN OSTER & TEJTEL, Bedford Hills, New York; *Counsel for Plaintiff Teamsters Union No. 142 Pension Fund.*

Rolin P. Bissell, Alberto E. Chávez, YOUNG CONAWAY STARGATT & TAYLOR, LLP, Wilmington, Delaware; Craig E. Zieminski, Andrew E. Jackson, VINSON & ELKINS LLP, Dallas, Texas; *Counsel for Defendants Rudy Adolf and Rajini Kodialam.*

Raymond J. DiCamillo, Robert L. Burns, Matthew W. Murphy, Nicholas F. Mastria, RICHARDS, LAYTON & FINGER, P.A., Wilmington, Delaware; Craig S. Waldman, Jacob Lundqvist, SIMPSON THACHER & BARTLETT LLP, New York, New York; *Counsel for Defendants James D. Carey, Fayez S. Muhtadie, Stone Point Capital LLC, Trident FFP LP, Trident VI L.P., Trident VI Parallel Fund, L.P., and Trident VI DE Parallel Fund, L.P.*

A. Thompson Bayliss, E. Wade Houston, Bryan M. Blaylock, ABRAMS & BAYLISS LLP, Wilmington, Delaware; Matthew Solum, Mary T. Reale, KIRKLAND & ELLIS LLP, New York, New York; *Counsel for Defendants Clayton, Dubilier & Rice, LLC, Ferdinand, FFP Acquisitions, LLC, Ferdinand FFP Merger Sub 1, Inc., and Ferdinand FFP Merger Sub 2, LLC.*

S. Mark Hurd, Emily Friedman, MORRIS, NICHOLS, ARSHT & TUNNELL LLP, Wilmington, Delaware; Robert J. Giuffra, Jr., Jonathan S. Carter, Alexander N. Gross, SULLIVAN & CROMWELL LLP, New York, New York; *Counsel for Defendant Goldman Sachs & Co. LLC.*

**McCORMICK, C.**

The defendants have moved to dismiss this class-action lawsuit asserting claims for breach of fiduciary duty in connection with a merger. The stockholder-plaintiffs allege that the merger was a conflicted-controller transaction subject to entire fairness review. They alternatively argue that their claims implicate enhanced scrutiny because the merger was an all-cash transaction. They also advance claims against the acquiror and one of the company's financial advisors for aiding and abetting breaches of fiduciary duties.

The plaintiffs have not adequately alleged the existence of a controller or control group to invoke entire fairness review. A 20% stockholder, who held rights under a credit agreement with the target company, agreed to rollover its shares and port the company's debt to the post-merger entity in exchange for rights in the post-merger entity. The plaintiffs are correct that this arrangement placed the stockholder in conflict with the company's minority stockholders. The plaintiffs do not sufficiently allege, however, that the 20% stockholder was a controller. To plead that a 20% stockholder exercised actual control to give rise to fiduciary duties, a stockholder must point to indicia in addition to share ownership to support an inference of actual control, which the plaintiffs have failed to do. The plaintiffs also fail to adequately allege that the 20% stockholder had a legally significant connection with other stockholders to form a control group. This decision grants the defendants' motions as to the controller and control group claim.

Absent a conflicted controller, the plaintiffs' claims are presumptively subject to enhanced scrutiny unless the transaction is approved by a fully informed,

uncoerced vote of the disinterested stockholders. The defendants obtained approval by the disinterested stockholders, but the plaintiffs allege that the vote was uninformed because the proxy statement suffers eight disclosure deficiencies.

Of the plaintiffs' eight theories, only one gives the court any pause. The plaintiffs allege that a strategic buyer, which made a competing offer, was behind in diligence compared to the ultimate acquiror because the defendants excluded the strategic buyer from the sale process. If true, a reasonable stockholder would consider the undisclosed facts material for a few reasons. For one, the company's financial advisor advised, and the stockholders were told, that strategic buyers would not have an interest in acquiring the company. For another, the disclosed rationale for agreeing to exclusivity with the ultimate acquiror was the strategic bidder's lack of progress in diligence.

The defendants maintain that the plaintiffs' factual allegations concerning the strategic bidder are false, citing to the documents on which plaintiffs base their allegations. For the purposes of the present motion, however, the court must draw reasonable inferences in the plaintiffs' favor. Because the plaintiffs' inferences are reasonable, the plaintiffs have adequately alleged a viable disclosure deficiency.

That said, it seems imprudent to allow the plaintiffs full-blown discovery into the sale process if the plaintiffs cannot prove the facts underlying their one viable disclosure theory. The court is therefore converting the motions to dismiss into motions for summary judgment to allow the plaintiffs limited discovery into the issues surrounding that theory.

The acquiror and financial advisor have moved to dismiss the plaintiffs' claims for aiding and abetting breaches of fiduciary duties. These claims are predicated on the plaintiffs' claims for breach of fiduciary duty, which will be further analyzed on summary judgment. The motions to dismiss the claims for aiding and abetting, therefore, are stayed pending resolution of the summary judgment motion.

## I.     FACTUAL BACKGROUND

The facts are drawn from the Verified Class Action Complaint (the "Complaint") and the documents it incorporates by reference.[1]

### A.     The Company And Stone Point

Focus Financial Partners Inc. ("Focus" or the "Company") acquires and partners with wealth management firms in the registered investment advisor industry. Focus operates through Focus Financial Partners, LLC ("Focus LLC"). Focus's former CEO, Defendant Rudy Adolf, founded Focus LLC in 2004. The LLC structure allowed Focus LLC to generate and distribute profits to its unitholders in a tax-advantaged manner.

Defendant Stone Point Capital LLC, an investment management firm ("Stone Point"), was among Focus's initial investors. Stone Point owns its interests in Focus through a series of funds, each of which is named as a defendant and included, for convenience, in the definition of "Stone Point."[2] During the relevant period, Stone

---

[1] C.A. 2024-0354, Docket Entry ("Dkt.") 1 ("Compl.").

[2] The funds are: Trident FFP LP, Trident VI, L.P., Trident VI Parallel Fund, L.P., and Trident VI DE Parallel Fund, L.P.

Point was Focus's largest stakeholder, owning approximately 20.6% of outstanding shares of Focus's Class A and B common stock.

## B. The Credit Agreement

In 2017, Focus LLC entered into a credit agreement with multiple banks (the "Credit Agreement"). During the relevant period, Focus owed approximately $2.5 billion outstanding under the Credit Agreement, which bore a favorable 4% weighted-average interest rate (below the 4.5% federal fund rate in place during the sale process described below).

Under Sections 11.11 and 11.12 of the Credit Agreement, a "Change of Control" transaction constituted an "Event of Default," which accelerated repayment under the Credit Agreement.[3] The agreement defined "Change of Control" to include any situation where a party acquired 35% or more of Focus's voting stock.[4] That definition contained a carveout: Focus's debt would not accelerate upon a change-of-control transaction if "Permitted Holders" had "the right or the ability by voting power, contract, or otherwise to elect or designate for election at least a majority of the board of directors of [Focus]."[5] The definition of Permitted Holders includes Stone Point, Adolf, and Focus's Chief Operating Officer, Rajini Kodialam.[6]

---

[3] Dkt. 42 ("Defs.' Opening Br."), Ex. 11 ("Credit Agr.") §§ 11.11, 11.12.

[4] Compl. ¶ 63; Credit Agr. § 1.1 at 17 (Definition of "Change of Control").

[5] *Id.*

[6] Compl. ¶ 63; *see also* Credit Agr. § 1.1 at 44 (Definition of "Initial Investors"), 56 (Definition of "Permitted Holders").

4

## C. The Reorganization And IPO

In July 2018, Focus LLC's unitholders approved an Up-C reorganization. An Up-C structure preserves some of the tax benefits conferred by an LLC structure while giving a company access to public markets. Because of the reorganization, Focus LLC became a wholly owned subsidiary of Focus. The reorganization allowed Focus to conduct an initial public offering ("IPO"), which closed in July 2018.

Stone Point executed a Nomination Agreement in connection with the IPO (the "Nomination Agreement"), which gave Stone Point the right to nominate two directors to the Focus Board of Directors (the "Board"). The Nomination Agreement also gave Stone Point two seats on the Board's three-person compensation committee (the "Compensation Committee").

## D. The Tax Receivables Agreement

After the reorganization, Focus would realize certain tax benefits when holders of Focus LLC units exchanged those units for Focus common stock. To allow those benefits to flow to Focus's pre-IPO investors, Focus executed tax receivable agreements ("TRAs") with certain Focus LLC unitholders, including Stone Point, Adolf, and Kodialam. The TRAs specified when the unit exchanges would occur, and they limited the number of units that could be exchanged in any given quarter. Under the agreements, 85% of any tax savings Focus realized from such exchanges would go to the exchanging unitholder (the "TRA Beneficiaries"), and the remaining 15% in value would stay with Focus.

While Focus operated in the ordinary course, the payments to the TRA Beneficiaries varied depending on the number of Focus LLC units exchanged and the

5

price of Focus's common stock on the exchange date. Higher stock prices resulted in greater tax benefits, and thus, greater payouts to the TRA Beneficiaries. Because no one could predict with certainty Focus's future stock price, the number of Focus LLC units exchanged, or the future status of applicable tax laws, there was no way to determine how much the TRA Beneficiaries would receive over time. But if Focus underwent a change-in-control transaction, the TRA Beneficiaries would be entitled to a lump-sum payment based on the hypothetical present value of all expected future payments under the TRAs, applying a contractually defined discount rate.

## E. The Sale Process

In early 2022, the Board comprised eight members: Adolf and Kodialam (the "Officer Directors"); two Stone Point designees, Defendants James Carey and Fayez Muhtadie (the "Stone Point Directors"); and four outside directors, non-parties Joseph Feliciani,[7] Greg Morganroth,[8] George LeMieux, and Elizabeth Neuhoff.[9] Carey and Muhtadie joined the Board in 2018 under the Nomination Agreement. Feliciani, Morganroth, LeMieux, and Neuhoff held interests in the TRAs through Focus LLC Incentive Units or Focus LLC Common Units, which they received as part of their compensation.

---

[7] Feliciani, former BlackRock, Inc. COO of Finance, joined the Board in 2019. Compl. ¶ 41.

[8] Morganroth, founder and CEO of the California Skin Institute, joined the Board in 2020. *Id.* ¶ 42.

[9] LeMieux and Neuhoff joined the Board on March 7, 2022. *Id.* ¶ 95. LeMieux is the Chairman of a Florida-based law firm, and Neuhoff is the CEO and President of a broadcast and digital media company. *Id.* ¶¶ 38, 40.

On March 30 and 31, 2022, the Board met in Big Sky, Montana for its first meeting since LeMieux and Neuhoff joined the board three weeks earlier. During the meeting, the Board discussed Focus's performance as well as its long-term plans and strategic goals. Two bankers from Goldman Sachs & Co. LLC ("Goldman") attended the meeting. The Board met again on May 11 and approved retaining Goldman and legal counsel to assist the Board in evaluating strategic options. Following the May 11 meeting, Adolf began contacting prospective M&A partners.

### 1. CD&R Expresses An Interest In Acquiring The Company.

Defendant Clayton, Dubilier & Rice LLC ("CD&R")[10] expressed interest in acquiring the Company during a June 16 meeting with Adolf. CD&R is a private equity firm that operates managed investment funds. According to its marketing materials, CD&R "tailors its investments to meet the needs of founders, family owners, management teams and significant shareholders."[11] CD&R also markets its practice of providing management with equity stakes in its portfolio companies: "[A] critical element of investment success is reward-sharing, which is why we emphasize incentives that support alignment, including substantial equity ownership for our portfolio company management teams."[12]

---

[10] This opinion defines "CD&R" to include defendants Ferdinand FFP Acquisitions, LLC, Ferdinand FFP Merger Sub 1, Inc., and Ferdinand FFP Merger Sub 2, LLC, the limited liability companies through which CD&R effectuated the transaction at issue.

[11] Compl. ¶ 100.

[12] *Id.*

On June 30, the Board met with Goldman and Focus's management to discuss officially commencing a sale process. Goldman focused its presentation on potential financial partners for a leveraged buyout or a take-private transaction. Goldman identified CD&R as a potential transaction partner at the June 30 meeting.

### 2. Goldman Warns That It Is A Challenging Market To Execute A Deal.

At the same meeting, Goldman warned that it was a "[c]hallenging market to execute a deal" and that there was "limited upside in engaging at this point[.]"[13] Goldman further warned that executing a non-disclosure agreement ("NDA") with a potential acquiror "[m]ay create noise in the market" and have little positive effect because of the "[c]hallenging financing market[.]"[14] Goldman advised the Board that the Company could "engage later" when the financing markets improved.[15] Despite Goldman's warnings, the Board executed an NDA with CD&R on July 13.

Adolf also met with other potential private-equity buyers throughout July and August. They did not engage due to the challenging financing market. One firm was "[u]ncomfortable putting forth a bid in August due to [the] financing market backdrop."[16] A second firm asked to "re-engage when financing markets normalize."[17] A third firm would support a deal only as a co-investor and was unwilling to engage before Labor Day. A fourth firm was interested in Focus, but it was looking "to pursue

---

[13] *Id.* ¶ 102.

[14] *Id.*

[15] *Id.*

[16] *Id.* ¶ 105.

[17] *Id.*

changes to [the] business model if taken private"—forecasting a possible change in Focus's management.[18] Of the five potential financial sponsors Goldman initially contacted, CD&R seemed the only firm willing to move forward quickly.

### 3. CD&R Makes An Oral Offer To Acquire Focus.

On August 11, CD&R made an oral offer to acquire Focus in cash at a per share price in the mid- to high-$40s. Focus informed CD&R that it was not interested in a transaction at that price. On September 14, CD&R submitted its first written offer at $50 per share in cash. The September 14 proposal stated that "CD&R has established its reputation by helping management teams" and that "CD&R would be an outstanding partner for the management team[.]"[19]

### 4. Goldman Introduces Focus To WEG, A Potential Strategic Acquiror.

On September 20, as Focus negotiated with CD&R, Goldman introduced Adolf to Jeff Dekko, the CEO of Wealth Enhancement Group ("WEG"), a potential strategic acquiror. The Board did not know about this introduction or that there was a strategic acquiror interested in Focus. Dekko and Adolf met on November 15.

On September 21, the Board met with Focus management, Goldman, and the Company's outside counsel, Vinson & Elkins LLP ("V&E"). Two Stone Point representatives who were not on the Board—Nikhil Dixit and Alexander Sarnoff (a Stone Point Vice President responsible for Stone Point's Focus investment)—also attended. At the meeting, Goldman relayed the concerns that it had heard from

---

[18] *Id.*

[19] *Id.* ¶ 110.

potential acquirers regarding the challenging financing market and reiterated its advice that poor market conditions made it a bad time to run a sale process.

Despite this advice, the Board continued with the sale process. With Dixit, Sarnoff, the Stone Point Directors, and the Officer Directors present, the Board authorized management to allow CD&R to conduct due diligence. Neither Goldman nor Adolf informed the Board of WEG's indication of interest or that WEG's CEO had been trying to schedule a meeting with Adolf.

### 5. A Focus Subsidiary Also Hires Goldman.

While the Focus sale process was underway, a Focus subsidiary, NKSFB LLC, hired Goldman to advise on its own sale. NKSFB offered concierge-style services to artists in music, film, and television, as well as athletes, executives, entrepreneurs, and the like. Focus acquired NKSFB in April 2018. After, the former owners of NKSFB managed the business through a separate entity, KSFB Management LLC ("KSFB"). Focus pushed for KSFB to hire Goldman, which it eventually did on September 16, 2022. The same Goldman banker working on the Focus sale acted as the lead for the NKSFB sale.

### 6. The Focus Board Forms A Special Committee.

On November 1, months after CD&R signed its NDA and began performing diligence, the Board executed a written consent forming a special committee to negotiate, review, and evaluate potential transactions (the "Special Committee"). The Special Committee retained Potter Anderson & Corroon LLP ("Potter Anderson") to serve as its legal advisor and engaged Goldman as its financial advisor.

10

The Special Committee comprised LeMieux, Neuhoff, Morganroth, and Feliciani, with LeMieux as chair. Neuhoff and Morganroth received $40,000 to serve on the committee; LeMieux received $80,000 to chair it. None of the committee members had ever overseen or conducted a sale process of a publicly traded company. Nor did any committee member have expertise in Focus's industry. Each member of the Special Committee stood to receive lump sum TRA payments if Focus was sold.

On November 9, CD&R made a revised oral offer to Focus for $45 per share—five dollars less than its September 14 offer. In support of its lowered bid, CD&R cited recent challenges in the financing markets and a revised estimate as to the cost of the TRA payouts. With its updated offer, CD&R conveyed that it "would require a partner or partners in connection with a transaction" and expected any deal would include a "material roll-over of equity."[20]

### 7. Stone Point Considers Joining CD&R On The Buy-Side.

Goldman did not immediately relay the November 9 proposal to the Special Committee. Instead, Goldman contacted Stone Point to gauge its interest in participating on the buy side of a sale with CD&R and rolling over some or all of its equity interest in the potential transaction. After that conversation, Stone Point informed LeMieux that it was interested in moving forward as a bidder.

On November 10, the Special Committee met to discuss CD&R's November 9 proposal. LeMieux reported that Stone Point was interested in partnering with CD&R in a potential transaction. The Special Committee granted Stone Point access

---

[20] *Id.* ¶ 130.

11

to Focus's confidential data room. For the remainder of November, Goldman, Stone Point, and CD&R continued to discuss the November 9 offer.

On November 15, weeks after their September 20 introduction, Adolf met with WEG's CEO, Dekko. During the meeting, Dekko indicated that WEG was interested in engaging in a transformative transaction with Focus. Adolf did not inform the Special Committee that he intended to take the meeting with Dekko.

On November 23, the Special Committee met with Potter Anderson and Goldman. At the meeting, Goldman relayed its conversations with Stone Point and CD&R and discussed its preliminary financial analysis of the Company, including its belief that the markets were undervaluing Focus's stock. Goldman also flagged the continuing poor market conditions, highlighting that the "state of the financial markets could have a negative impact on bidders' willingness to move forward with exploring a potential acquisition[.]"[21] Neither Goldman nor Adolf informed the Special Committee of Adolf's meeting with WEG's CEO, nor of WEG's purported interest in participating in a transaction.

On November 30, the Special Committee met again with Potter Anderson and Goldman. At the meeting, Goldman advised "the Committee that there were no likely strategic buyers for the Company."[22] Goldman did not inform the Special Committee of WEG's interest or the November 15 meeting between Adolf and Dekko. Goldman told the Special Committee it should view the purported lack of interest from other

---

[21] *Id.* ¶ 146.

[22] *Id.* ¶ 151.

potential bidders, including the private equity funds that had been previously contacted, as "instructive for the Committee's evaluation of a Potential Transaction."[23] But Goldman did not relay that it had not reached out to those firms recently, including to raise the concept of a Stone Point rollover.

On December 1, CD&R submitted a revised proposal to acquire Focus for $47.50 per share. The proposal assumed "that all the [C]ompany's debt for borrowed money would remain outstanding following the closing of the proposed transaction" and further explained that there would be a "lower per share price" if there "were additional costs of borrowing."[24] The proposal also conveyed that CD&R was impressed by Focus's management team and that CD&R would discuss its partnership with management, management agreements, and management's rollover of its existing equity stake.

The next day, the Special Committee met with Potter Anderson and Goldman to discuss the December 1 proposal, including the proposed financing terms. At the meeting, the Special Committee concluded that CD&R's offer was not worth pursuing and that the Committee was going "pencils down."[25]

Stone Point kept pushing for a deal. Three days after the Special Committee went pencils down, Stone Point met with CD&R. One day later, on December 6, Stone Point Director Muhtadie met with LeMieux and conveyed his opinion that Focus

---

[23] *Id.*

[24] *Id.* ¶ 153.

[25] *Id.* ¶ 158.

"could perform better as a private company."[26]   He also noted, with respect to the price of CD&R's offer, that the Company's average trading price was "significantly lower than [the] $68 per share" price Focus had reached at times during 2021.[27]

The Special Committee next met on December 7.  LeMieux reported that he had additional conversations with Stone Point regarding CD&R's December 1 offer. LeMieux also told the Special Committee that Adolf told him that another private equity firm had expressed interest in acquiring Focus.  Adolf did not tell LeMieux (or any other members of the Special Committee) about the interest of potential strategic acquiror WEG.

On December 10, CD&R submitted a revised written proposal to acquire Focus for the same price as the September 14 proposal, $50.00 per share.  The December 10 offer requested exclusivity and conveyed CD&R's interest in structuring any transaction such that the Company's debt would not accelerate under the Credit Agreement.

The Special Committee met on December 12 and 14 to discuss the new proposal.  At the December 12 meeting, Goldman stated that it had not seen a strategic buyer engage in discussions regarding a potential acquisition of Focus and that it did not view the Company's business as one that would fit well with a strategic buyer.  At the December 14 meeting, Goldman focused on the change-of-control provision of the Credit Agreement.  Muhtadie and Goldman told the Special

---

[26] *Id.* ¶ 160.

[27] *Id.*

14

Committee that "if Stone Point did not participate on the purchaser side in a Potential Transaction, CD&R had assumed that the existing capital structure could not remain in place."[28]

### 8. The Special Committee Retains A Second Financial Advisor, Jefferies.

On December 16 and 17, the Special Committee discussed retaining a second financial advisor. Jefferies LLC ("Jefferies"), Evercore, and Houlihan Lokey all made presentations to the committee. Of the three, only Jefferies raised the issue of Focus's debt under the Credit Agreement and the importance of ensuring the debt remained portable in any transaction. The Special Committee retained Jefferies. Jefferies's initial engagement letter with the Special Committee provided for compensation of $4.5 million contingent on a qualifying transaction, with the potential for a bonus of up to $1 million at the Special Committee's discretion.

On December 18, Goldman informed the Special Committee that CD&R requested a response to its December 10 offer. The proposal indicated that CD&R was open to a post-signing go-shop, but Goldman told the Special Committee that it was "rare that a go-shop would increase the consideration received by [Focus's] stockholders[.]"[29] Goldman also informed the Special Committee that it was rare to see another private equity bidder submit a topping bid in a transaction already involving a private equity buyer. Goldman again reminded the Special Committee that the Permitted Holders would need control over the post-close Board to avoid

---

[28] *Id.* ¶ 167.

[29] *Id.* ¶ 174.

15

accelerating the Company's debt. The Special Committee determined it wanted to speak with Jefferies before formally responding to CD&R.

### 9. The Company Conducts A Market Check.

Also at the December 18 meeting, the Special Committee determined to have Jefferies conduct a market check. By that point, CD&R already had six months to complete a "comprehensive diligence process."[30]

On December 28, the Special Committee met with Potter Anderson, Goldman, and Jefferies to discuss conducting a market check. At the meeting, which was to discuss outreach to other potential buyers, Goldman conveyed that Stone Point was "not agnostic with respect to potential partners in an acquisition of the Company and had expressed certain views on potential partners."[31] Goldman also advised that, "since Stone Point may be participating on the buyer side, it was disincentivized to support a higher price per share in a potential acquisition of the Company[.]"[32] Against this backdrop, the Special Committee authorized Goldman and Jefferies to contact seven financial sponsors—four of which Focus had talked to at the beginning of the sale process—and one strategic acquiror, WEG.

During the December 28 meeting, the Special Committee learned that Adolf had met with WEG's CEO in November and that WEG had expressed an interest in acquiring Focus.

---

[30] *Id.* ¶ 176.

[31] *Id.* ¶177.

[32] *Id.* ¶ 178.

Jefferies informed the Special Committee that, due to CD&R's head-start in the sale process, WEG and other potential bidders would need to engage in a significant amount of diligence to be on the same footing as CD&R. Jefferies and Goldman did not contact the potential bidders until the holiday week between Christmas and New Year's Day. In their communications, they relayed that "[g]iven the current challenging financial markets, we think there is a path to roll the current, recently-updated capital structure with Stone Point's support."[33]

On January 4, 2023, the Special Committee met with its advisors to discuss the results of the market check and CD&R's December 10 proposal. Goldman reported that potential bidders had inquired about the portability of Focus's existing debt. After conveying this, Goldman reiterated to the Special Committee that Stone Point was "not agnostic with respect to potential partners in an acquisition of the Company and had expressed certain views on potential partners."[34]

On January 5, CD&R made a "best and final offer" to acquire Focus for $51.50 per share.[35] CD&R threatened to stop pursuing the deal if the Special Committee did not respond within a week. The Special Committee met the next day. At the meeting, the Special Committee discussed that other potential bidders felt that the sales process had been skewed in CD&R's favor. One potential bidder stated it would "only [participate] if the process was on a level playing field, and . . . would not participate

---

[33] *Id*. ¶ 183.

[34] *Id*. ¶ 192.

[35] *Id*. ¶ 195.

17

in a post-signing go shop."[36]  Another potential bidder stated that it "did not want to serve as a 'stalking horse' in a bidding process."[37]

On January 7, 2023, the Special Committee held a meeting attended by the committee members, Adolf, and Carey.  Carey acknowledged that Stone Point's participation would likely be necessary for any financial sponsor to make a successful bid.  Adolf also informed the Special Committee that Focus management was supportive of a deal at $51.50 per share and informed the Special Committee that if Stone Point did not participate as a buyer, the Company would likely have to refinance its debt.

On January 10, the Special Committee met with Potter Anderson, who conveyed that Stone Point supported CD&R's January 5 offer and stated it would not participate as a buyer and rollover at any price above $51.50 per share.  On January 11, Goldman told the Special Committee that it was "not worthwhile" to engage with one potential bidder due to Stone Point's position "that it would not make an additional equity investment at a price per share above $51.50."[38]

On January 12, the Special Committee conveyed to CD&R that it was attempting to bridge the valuation gap between CD&R's offer and Focus's strong stock price by asking Stone Point and management to forgo the TRA payouts that would be due upon completion of a change-of-control sale.  The next day, Stone Point

---

[36] *Id.* ¶ 196.

[37] *Id.*

[38] *Id.* ¶ 275.

informed the Special Committee's advisors that it would not agree to forgo or reduce the amount of its TRA payments.

### 10. WEG Submits An Offer To Acquire Focus.

On January 17, 2023, WEG submitted a written proposal to acquire Focus for $51.75 per share in cash. WEG's proposal was predicated on "consolidat[ing] management and operations" to achieve "meaningful cost savings[.]"[39] WEG stated that although it would support an equity rollover from Stone Point, it would not require participation from Stone Point to complete the transaction. In other words, WEG's offer, unlike CD&R's, provided no suggestion that management would maintain their roles at Focus after the deal or that Stone Point would obtain governance rights in the post-close company. WEG also represented that it was "prepared to move quickly with our confirmatory due diligence . . . [w]ith the appropriate assistance from and access to management."[40]

The Special Committee discussed WEG's proposal the next day. The Special Committee's advisors noted that WEG's proposal was only worth $50.95 per share, because it based its calculation of TRA liability on publicly available information. Focus provided WEG with updated information concerning the TRA payouts but did not provide any additional diligence that WEG requested.

On January 21, CD&R indicated it might offer $52.00 per share if Stone Point and management agreed to defer—but not waive—their TRA payments. Stone Point

---

[39] *Id.* ¶ 208.

[40] *Id.*

and management promptly agreed. On the same day, the Special Committee met, and Goldman advised that a WEG deal faced significant execution risk, particularly given that CD&R had substantially completed diligence. The Special Committee instructed its advisors to inform WEG that it would only have access to additional diligence materials if it submitted an offer at $55.00 per share.

On January 22, WEG disclosed that it was prepared to increase its offer to $55.00 per share. In connection with the increased offer, WEG requested exclusivity because it "was starting at an informational disadvantage to other bidders[.]"[41] On January 24, WEG confirmed that it would up its offer to $55.00 per share only if Focus would agree to exclusivity. Without exclusivity, WEG noted that it would continue evaluating a potential deal at $51.75 per share—$0.25 higher than CD&R's most recent offer. On January 27, WEG provided the Special Committee with a draft exclusivity agreement.

### 11. CD&R Submits A Final Offer.

On January 28, the Special Committee met, and Goldman expressed skepticism regarding WEG's offer, claiming that WEG had a "long way to go" to finance a deal.[42] Midway through the meeting, CD&R called Goldman to convey that they would increase their offer to $53 per share if Focus agreed to exclusivity. CD&R also indicated that it expected Stone Point to make an investment in the post-close company in addition to rolling over its equity. The Special Committee authorized

---

[41] *Id.* ¶ 215.

[42] *Id.* ¶ 223.

Goldman to respond that the Special Committee was prepared to have Focus move forward on an exclusive basis with CD&R at an offer price of $53 per share. This offer assumed that Stone Point and management agreed to defer their TRA payouts. Stone Point confirmed its support the same day.

On January 29, CD&R orally agreed to proceed with their $53 per share offer. CD&R stated that it would need three to four weeks to complete diligence, arrange equity financing, and negotiate the definitive transaction. WEG had indicated that it only needed "three to four weeks" to complete its own diligence and financing arrangements for its offer that was $2 higher than CD&R's.[43] The next day, Focus signed an exclusivity agreement with CD&R that ran through February 20.

WEG contacted Jefferies and Goldman on February 2 to request permission from the Special Committee to contact potential financing sources. On the same day, Focus announced CD&R's $53 per share offer and its exclusivity arrangement with CD&R. Given the exclusivity agreement, the Special Committee did not respond to WEG's February 2 request.

### 12. The Board Increases Compensation For Special Committee Members And Jefferies.

During a February 8, 2023 meeting, the Special Committee members raised a concern that they and Jefferies were being underpaid. On February 25, the Special Committee met again, and Potter Anderson reported that it had discussed the Special

---

[43] *Id.* ¶ 225.

Committee's and Jefferies's fees with Focus's outside counsel. The Special Committee agreed to raise the cap on Jefferies's discretionary bonus from $1 million to $8 million.

On February 26, the Special Committee met to consider accepting CD&R's offer. Before voting to approve the transaction, the Special Committee took a break, during which Defendants Carey, Adolf, and Kodialam executed a written consent that increased the compensation for the Special Committee members: LeMieux's Special Committee compensation went from $80,000 to $280,000, and each of the remaining committee members' compensation increased 600%, from $40,000 to $240,000. Defendant Muhtadie had signed the written consent before the meeting. The Special Committee members each signed the written consent either during or shortly after the meeting.

### 13. Focus And CD&R Execute The Merger Agreement.

After reconvening, the Special Committee listened to Goldman's and Jefferies's fairness opinions and voted to approve the proposed transaction with CD&R (the "Merger"). The same day, Focus's full board met to review the Special Committee's recommendation and the proposed transactional documents and voted unanimously to approve the Merger. On February 27, 2023, the parties entered into an Agreement and Plan of Merger (the "Merger Agreement").

Also on February 27, 2023, Stone Point entered into two additional agreements.

First, Stone Point and the Officer Directors signed TRA Waiver and Exchange Agreements (the "TRA Waiver Agreements"). Under the TRA Waiver Agreements, Stone Point and the Officer Directors agreed to receive a portion of their TRA payouts

in the form of promissory notes at the closing of the Merger. The promissory notes mature on September 30, 2028, and accrue interest at a favorable 8% annual rate.

Second, Stone Point executed a support agreement with CD&R that was approved by the Board and the Special Committee (the "Support Agreement"). Under the Support Agreement, Stone Point agreed to roll over half of its equity—or approximately 10% of Focus's pre-Merger equity. In exchange, and under another agreement concerning the governance of the post-Merger entity (the "Interim Investors Agreement"), Stone Point gained the right to appoint a majority of the post-Merger Board.

### 14. Focus Issues A Proxy Statement, Obtains Stockholder Approval, And Closes The Merger.

The Merger Agreement provided for a forty-day go-shop period and gave CD&R four days to match any superior offer. The go-shop occurred between February 27 and April 3 and expired without Focus receiving any additional offers. The Company issued a definitive proxy statement seeking stockholder approval of the Merger Agreement on June 12, 2023. On July 6, 2023, Focus filed a "Supplement to the Definitive Proxy Statement" (together with the June 12 proxy statement, the "Proxy Statement").[44] On July 14, a majority of Focus stockholders approved the transaction, which closed on August 31.

---

[44] *Id.* ¶ 263; Defs.' Opening Br., Ex. 5 ("Proxy Statement").

## F.    This Litigation

With the aid of documents obtained through a pre-suit investigation under Section 220 of the DGCL, Anchorage Police & Fire Retirement System and Teamsters Union No. 142 Pension Fund ("Plaintiffs") filed this action on April 3, 2024.[45] The Complaint names as defendants Stone Point, the Stone Point Directors, the Officer Directors, Goldman, and CD&R (collectively, "Defendants").

The Complaint contains seven counts:

- In Count I, Plaintiffs claim that Stone Point, the Stone Point Directors, and the Officer Directors comprised a control group and breached their duties as controllers by causing Focus to "run an unfair sale process and by approving the unfair Merger" and "by approving and disseminating [a] materially misleading Proxy[.]"[46]

- In Count II, Plaintiffs claim that the Officer Directors breached their fiduciary duties as officers by "vot[ing] to approve the Merger, despite the unfair and unreasonable sale process and the unfair and inadequate Merger price" and "caus[ing] the issuance of [a] materially false and misleading Proxy."[47]

- In Count III, Plaintiffs claim that the Officer Directors breached their fiduciary duties as directors by "vot[ing] to approve the Merger, despite the unfair and unreasonable sale process and the unfair and inadequate Merger price" and "caus[ing] the issuance of [a] materially false and misleading Proxy."[48]

- In Count IV, Plaintiffs claim that the Stone Point Directors breached their fiduciary duties as directors by "us[ing] their positions on the Board and the Credit Agreement to undermine the sale process" and "approv[ing] the materially misleading Proxy."[49]

---

[45] *See generally* Compl.

[46] Compl. ¶¶ 302–03.

[47] *Id.* ¶¶ 310–11.

[48] *Id.* ¶¶ 317–18.

[49] *Id.* ¶ 322.

24

- In Count V, Plaintiffs claim that Goldman aided and abetted the foregoing breaches of fiduciary duty by "misleading the Board and Special Committee concerning strategic acquiror interest in Focus" and "limiting outreach to certain potential bidders and/or deterring potential bidders in favor of Stone Point and CD&R[.]"[50]

- In Count VI, Plaintiffs claim that CD&R aided and abetted the foregoing breaches of fiduciary duty by "failing to disclose material information to public stockholders prior to the Merger vote."[51]

- In Count VII, Plaintiffs claim that if the court does not find that Stone Point acted as a controller or part of a control group, that Stone Point aided and abetted the foregoing breaches of fiduciary duty by "helping to orchestrate the Merger to obtain liquidity on [its] investment horizon and providing Stone Point with post-closing-control of the privately-owned Focus[.]"[52]

Defendants moved to dismiss the Complaint,[53] the parties completed briefing on September 10, and the court heard argument on October 23.[54]

## II. LEGAL ANALYSIS

All Defendants have moved to dismiss the Complaint under Court of Chancery Rule 12(b)(6) for failure to state a claim on which relief can be granted. "[T]he governing pleading standard in Delaware to survive a motion to dismiss is reasonable 'conceivability.'"[55] When considering such a motion, the court must "accept all well-pleaded factual allegations in the [c]omplaint as true . . . , draw all reasonable inferences in favor of the plaintiff, and deny the motion unless the plaintiff could not

---

[50] *Id.* ¶ 326.

[51] *Id.* ¶ 329.

[52] *Id.* ¶ 336.

[53] Dkts. 25–28.

[54] *See* Dkt. 89 ("Oral Arg. Tr.").

[55] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Capital Hldgs. LLC*, 27 A.3d 531, 537 (Del. 2011).

recover under any reasonably conceivable set of circumstances susceptible of proof."[56] The court, however, need not "accept conclusory allegations unsupported by specific facts or . . . draw unreasonable inferences in favor of the non-moving party."[57]

## A. Count I Against The Alleged Controllers

Count I is premised on the claim that Stone Point, the Stone Point Directors, and the Officer Directors, acting together, exercised control over Focus and the Merger such that they owed fiduciary duties to Plaintiffs and the Company. Plaintiffs also argue that Stone Point, acting alone, was a controller with concomitant fiduciary duties.[58] This analysis begins with the latter assertion.

Stone Point does not hold a mathematical majority of Focus's voting power. In such a case, a plaintiff may plead controller status by alleging facts sufficient to support an inference that the defendant "exercises control over the business affairs of the corporation."[59] For this purpose, a plaintiff need not argue that the defendant exercised general control over the business and affairs of the corporation. Although a showing of "general control" is sufficient to establish fiduciary status, a plaintiff can plead fiduciary status by alleging that the defendant controlled the particular transaction at issue, referred to as "transaction-specific" control.[60]

---

[56] *Id.* at 536 (citing *Savor, Inc. v. FMR Corp.*, 812 A.2d 894, 896–97 (Del. 2002)).

[57] *Price v. E.I. du Pont de Nemours & Co.*, 26 A.3d 162, 166 (Del. 2011) (citing *Clinton v. Enter. Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009)).

[58] Dkt. 55 ("Pls.' Answering Br.") at 46.

[59] *Ivanhoe P'rs v. Newmont Min. Corp.*, 535 A.2d 1334, 1344 (Del. 1987).

[60] *Voigt v. Metcalf*, 2020 WL 614999, at *11–12 (Del. Ch. Feb. 10, 2020); *Basho Techs. Holdco B, LLC v. Georgetown Basho Invs., LLC*, 2018 WL 3326693, at *25–26 (Del.

To successfully plead general control, a plaintiff must allege facts indicating "that a defendant or group of defendants exercised sufficient influence 'that they, as a practical matter, are no differently situated than if they had majority voting control.'"[61] One way to do so is to allege "that the defendant, 'as a practical matter, possesses a combination of stock voting power and managerial authority that enables him to control the corporation, if he so wishes.'"[62] Among other things, the analysis of general control looks to the alleged controller's ability to exert influence as a stockholder, in the boardroom, and outside the boardroom through managerial roles. Breaking these categories down to "indicia of effective control," the factors include:

- "ownership of a significant equity stake (albeit less than a majority),"

- "the right to designate directors (albeit less than a majority),"

- "decisional rules in governing documents that enhance the power of a minority stockholder or board-level position," and

- "the ability to exercise outsized influence in the board room, such as through high-status roles like CEO, Chairman, or founder."[63]

To successfully allege transaction-specific control, a plaintiff must plead facts indicating that the defendant "exercise[d] actual control over the board of directors during the course of a particular transaction[.]"[64] This analysis often focuses on

---

Ch. July 6, 2018), *aff'd sub nom. Davenport v. Basho Techs. Holdco B, LLC,* 221 A.3d 100 (Del. 2019).

[61] *Basho,* 2018 WL 3326693, at *25 (quoting *In re PNB Hldg. Co. S'holders Litig.,* 2006 WL 2403999, at *9 (Del. Ch. Aug. 18, 2006)).

[62] *Id.* (quoting *In re Cysive, Inc. S'holders Litig.,* 836 A.2d 531, 553 (Del. Ch. 2003)).

[63] *Id.* at *27 (citations omitted).

[64] *In re W. Nat'l Corp. S'holders Litig.,* 2000 WL 710192, at *20 (Del. Ch. May 22, 2000) (citation omitted).

27

"relationships with key managers or advisors who play a critical role in presenting options, providing information, and making recommendations[.]"[65] It can also address "the exercise of contractual rights to channel the corporation into a particular outcome by blocking or restricting other paths," and "commercial relationships[.]"[66]

Both general control and transaction-specific control call for a holistic evaluation of sources of influence. "Rarely (if ever) will any one source of influence or indication of control, standing alone, be sufficient to make the necessary showing."[67] "Different sources of influence that would not support an inference of control if held in isolation may, in the aggregate, support an inference of control."[68] "Sources of influence and authority must be evaluated holistically, because they can be additive."[69] "Invariably, the facts and circumstances surrounding the particular transaction will loom large."[70]

### 1. Plaintiffs Fail To Plead That Stone Point Exercised Control.

Plaintiffs advance theories of both general and transaction-specific control. This analysis addresses whether Stone Point held transaction-specific control with

---

[65] *Basho*, 2018 WL 3326693, at *26 (concluding on a motion to dismiss that the defendant's relationship with management, including tips received by defendant from company's officers that provided negotiating leverage, supported an inference of control (citing *OTK Assocs., LLC v. Friedman*, 85 A.3d 696, 706–07 (Del. Ch. 2014))).

[66] *Basho*, 2018 WL 3326693, at *26 (citations omitted); *see also Skye Mineral Inv'rs, LLC v. DXS Cap. (U.S.) Ltd.*, 2020 WL 881544, at *26–27 (Del. Ch. Feb. 24, 2020).

[67] *Basho*, 2018 WL 3326693, at *28 (citations omitted).

[68] *Voigt*, 2020 WL 614999, at *13.

[69] *Id.*

[70] *Basho*, 2018 WL 3326693, at *28.

respect to the Merger. There are many reasons why a court often focuses on transaction-specific control when addressing claims like those asserted by Plaintiffs. For one, control allegations typically arise in the context of a transaction, making it logical to evaluate the indicia of control in the context of events surrounding the transaction. Moreover, where it is not reasonably conceivable that an individual or group exercised transaction-specific control, it is hard to make a case for general control. Additionally, because "[b]roader indicia of effective control also play a role in evaluating whether a defendant exercised actual control over a decision[,]"[71] the sources of influence identified by a plaintiff in support of a finding of general control factor into the transaction-specific analysis.

Here, Plaintiffs have not adequately alleged transaction-specific control, and it is not reasonably conceivable that Stone Point or the alleged control group exercised general control.

Plaintiffs argue the following factors support an inference that Stone Point exerted transaction-specific control of Focus in connection with the Merger:

- Stock Ownership: Stone Point held approximately 20.6% of the Company's equity at the time of the Merger.[72]

- Influence Over Charter And Bylaw Amendments: Focus's charter requires approval by "the holders of at least 66 2/3 % in voting power of the outstanding shares of stock of [Focus] entitled to vote generally in the election of directors" to amend the charter and "the vote of holders of not less than 66 2/3 % in voting power of the then-outstanding shares of stock entitled to vote thereon" to amend the bylaws.[73] Plaintiffs argue

[71] *Id.* at *27.

[72] Compl. ¶ 25.

[73] *Id.* ¶ 56; Defs.' Opening Br., Ex. 26 at 6–7, 11.

Stone Point's nearly 21% stake gave it "an effective veto over such amendments."[74]

- The Nomination Agreement: Under the Nomination Agreement, Stone Point was entitled to appoint two directors to the Board[75] and two directors to the three-member Compensation Committee.[76]

- The Credit Agreement: Stone Point was a Permitted Holder under the change-of-control carveout. As a Permitted Holder, Stone Point could help an acquiror avoid triggering an Event of Default by retaining, post-merger, the right or the ability by voting power, contract, or otherwise to elect or designate for election at least a majority of the board of directors of Focus. "Porting" the Credit Agreement in this way allowed an acquiror to offer $3.00–$4.00 more per share.[77] Thus, Stone Point had unique negotiating leverage because Stone Point had the ability to make Focus's debt portable.[78]

- Special Committee Compensation: The Compensation Committee elected to compensate Focus's non-employee directors with Focus LLC units, making them eligible to become TRA Beneficiaries. The Merger would trigger lump-sum TRA payments to all Focus LLC unitholders and accelerate the vesting of the Special Committee members' Focus LLC units. Plaintiffs argue this incentivized the Special Committee to recommend the Merger.[79]

### a. Stock Ownership

"All else equal, a relatively larger block size should make an inference of actual control more likely[.]"[80] This is due to the mathematics of voting because the existence of a larger block leaves fewer shares held by individuals who could be

---

[74] Pls.' Answering Br. 49–50.

[75] Compl. ¶ 57.

[76] *Id*. ¶¶ 58–59.

[77] *Id*. ¶ 64.

[78] Pls.' Answering Br. at 56–57.

[79] *Id*. at 58.

[80] *Voigt*, 2020 WL 614999, at *17 (emphasis omitted).

30

convinced to oppose the blockholder's wishes. As the blockholder's stake increases, opponents must poll at historically unachievable supermajority rates to overcome the blockholder's advantage.[81] At the same time, compared to a smaller blockholder, a larger blockholder needs the support of fewer other investors to carry a vote.[82] Although not applicable here, quorum requirements and levels of voter turnout may render some levels of ownership equivalent to majority control. With 80% turnout, for example, a 40.0001% blockholder has the same effective voting power as the holder of a mathematical majority.[83]

With these dynamics in mind, Stone Point's just-over-20% block size is influential. As this court has explained, "if the holder of a 21.9% block favors a particular outcome, then the holder will win as long as holders of approximately one-in-three shares vote the same way. By contrast, an opponent must garner approximately 71% of the unaffiliated shares to win."[84] So, Stone Point's 20.6%

---

[81] *Id.* at *18 (citation omitted). For example, "assuming a meeting where holders with 80% of the voting power turn out, and the standard is a majority of the shares present and entitled to vote . . . if the holder of a 35% block favors a particular outcome at a meeting, then the blockholder will win as long as holders of 1-in-7 shares vote the same way. The opponents must garner over 90% of the unaffiliated shares to win." *Id.*

[82] *See generally id.* at *18–19 (discussing the mathematics behind this principle in detail).

[83] *Id.* at *18 (citing 8 *Del. C.* § 216(2) (requiring a "majority of shares present in person or represented by proxy," once a quorum is present, to take action), (3) (requiring "a plurality of the votes of the shares present in person or represented by proxy," once a quorum is present, to elect directors)). "Meetings typically attract participation from just under 80% of the outstanding shares. At that level, the holder of a 40% block can deliver the vote needed to prevail at a meeting." *Id.*

[84] *Tornetta v. Musk*, 310 A.3d 430, 502 (Del. Ch. 2024).

interest in Focus gave it a weighty say in the outcome of any vote. That said, this court has found that a 20% (or less) blockholder exercised sufficient control to be a fiduciary only in rare circumstances, and only then when buttressed by other indicia of control.[85]

### b.     Influence Over Charter And Bylaw Amendments

Stone Point's alleged "effective veto" over amendments to Focus's charter and bylaws is not in play here because the Merger did not implicate Stone Point's veto power. Nor is there any indication that Stone Point had ever wielded this power or threatened to use it to secure a desired outcome in this transaction or otherwise.[86]

---

[85] *See, e.g., In re Pattern Energy Gp. Inc. S'holders Litig.*, 2021 WL 1812674, at *41–46 (Del. Ch. May 6, 2021) (finding it reasonably conceivable that a stockholder owning "slightly more than 10%" was a controller who had consent rights and threatened to use it to control decisions); *FrontFour Cap. Gp. LLC v. Taube*, 2019 WL 1313408, at *21–24 (Del. Ch. Mar. 11, 2019) (finding post-trial that stockholders who collectively owned "less than 15%" of the company's stock were controllers where they were the founders and officers of the company, managed the day-to-day operations, and had control of deal structures and information flow); *In re Zhongpin Inc. S'holders Litig.*, 2014 WL 6735457, at *7–8 (Del. Ch. Nov. 26, 2014) (finding it reasonably conceivable that a stockholder owning 17.3% block was a controller because the stockholder was the CEO, and the company's 10-K stated that the stockholder effectively controlled the company), *rev'd on other grounds sub nom. In re Cornerstone Therapeutics Inc. S'holder Litig.*, 115 A.3d 1173 (Del. 2015); *Williamson v. Cox Commc'ns*, 2006 WL 1586375, at *1 n.4, 4–5 (Del. Ch. June 5, 2006) (finding it reasonably conceivable that two stockholders, owning collectively a 17.1% block, jointly controlled the company based on their ability to nominate two of the five directors, their ability to influence the flow of revenue into the corporation, and their potential "veto" power over certain corporate decisions).

[86] *Cf. Tornetta*, 310 A.3d at 503 n.586 (crediting a 21.9% blockholder's influence over charter and bylaw amendments subject to a supermajority voting provision where the blockholder had blocked amendments multiple times).

This factor does not favor an inference of transaction-specific control and only weakly supports an inference of general control.

### c. The Nomination Agreement

The rights conveyed through the Nomination Agreement inch a 20% blockholder closer to a controlling influence. The Nomination Agreement only gave Stone Point two out of the Company's seven to nine Board seats. Although Stone Point's representatives were incapable of carrying or blocking any Board action.[87] Stone Point's Board seats increase its influence over the transaction and the Company generally.

### d. Special Committee Compensation

The Nomination Agreement also gave Stone Point disproportionate representation on the Compensation Committee.[88] Plaintiffs argue that this gave Stone Point influence over the Merger in two ways.

First, the "Stone-Point-controlled Compensation Committee chose to compensate the Company's non-employee directors with Focus LLC units," thus making the Special Committee members potential TRA beneficiaries.[89] Plaintiffs say

---

[87] The Complaint states that Focus's Board only had seven members "[i]n early 2022." Compl. ¶ 95. By March 7, 2022, the Focus Board comprised nine members. By July 2022, there were eight Board members. *Id.* The Complaint alleges that the Board did not begin discussing the possibility of engaging in an M&A transaction until March 30 and 31 (*id.* ¶ 97), and Adolf didn't have his first meeting with CD&R until June 16 (*id.* ¶ 99). Thus, for most of the relevant period, the Board comprised eight members.

[88] *Id.* ¶ 58 ("The Nomination Agreement required that the Stone Point Directors be appointed to serve as two of the three members of the Compensation Committee; Muhtadie was appointed Chair.").

[89] Pls.' Answering Br. at 58.

that this maneuver incentivized the Special Committee members to pursue a deal over recommending that Focus continue as a standalone company.[90] But this point is not persuasive. The historical decision to compensate all non-employee directors with Focus LLC units does not indicate that Stone Point controlled the process leading to the Merger. The TRA payouts are better understood as a potential source of conflict rather than evidence of Stone Point's control.

Second, Plaintiffs argue that Stone Point "bribed the Special Committee members to further incentivize them to approve the Merger" by approving a "six-fold increase in the Special Committee members' fees" during an adjournment of the meeting at which the Special Committee approved the Merger.[91] Plaintiffs infer from this the Special Committee members wanted a raise, needed the non-committee directors to approve it, and promised support for the Merger to get it.

The last-minute pay increase is an unusual fact. But what of it? Plaintiffs do not do a great job of drawing out why this fact is relevant to the control analysis.

Plaintiffs do not argue that this alleged bribe was intended to induce the Special Committee members to stiff-arm WEG in favor of Stone Point's supposedly favored bidder. And for good reason. The Special Committee jettisoned WEG weeks earlier when they approved an exclusivity arrangement with CD&R and then worked to "finalize the deal contracts."[92] Plaintiffs do not develop an argument that the

---

[90] *Id.*

[91] *Id.* at 59–60.

[92] Compl. at ¶¶ 225, 228.

34

committee members felt some degree of owingness to Stone Point over the compensation decision. If that argument were viable, no doubt Plaintiffs would have advanced it. Based on the timing of the decision alone, Plaintiffs say that Stone Point controlled the process.

Plaintiffs emphasize that the Special Committee *adjourned* the meeting to wait for Carey, Adolf, and Kodialam to sign the written consent that increased their compensation. There is no basis to infer that Stone Point had power or sway over Adolf and Kodialam at this moment. The other Stone Point director, Muhtadie executed the written consent before the meeting.

### e.     The Credit Agreement

"Contractual rights that do not amount to a significant source of general control can, depending on the circumstances, give rise to an inference of transaction-specific control, because the holder of the contract rights can use them to channel a corporation into a particular outcome by blocking other paths."[93] In this way, the Credit Agreement presents an interesting wrinkle in this analysis. To maintain the Credit Agreement through a sale (and thus, keep Focus's debt from accelerating), the Permitted Holders (including Stone Point) would need to control a supermajority of Focus's post-transaction equity or have the right to appoint at least a majority of the post-merger board.

Plaintiffs argue that "[b]ecause Stone Point and the Officer [Directors] wanted to work with CD&R, they were willing to take the steps necessary to make the debt

---

[93] *Voigt*, 2020 WL 614999, at *19.

portable," which in turn, gave CD&R a "$2.00–$4.00 per share advantage in bidding for the Company."[94]    Defendants dispute this characterization of the Credit Agreement, noting that Stone Point, Adolf, and Kodialam, though Permitted Holders, were not parties to the Credit Agreement, and thus did not have to take any "steps" to make Focus's debt portable.  Instead, "[i]t was up to third-party bidders to decide if they wanted Focus's debt to remain outstanding, and if so, to allocate director appointment rights accordingly."[95]

Defendants get it partly right.  The decision to keep Focus's debt in place belonged foremost to Focus's bidders.  Portable debt was a selling point for some bidders but not others.  To be sure, Stone Point's unique ability to prevent an Event of Default accelerating debt under the Credit Agreement might have given Stone Point independent leverage in negotiations with bidders, as well as a reason to favor bidders willing to grant concessions to Stone Point.  The Credit Agreement, therefore, was another source of influence for Stone Point.

###### f.    Conclusion Regarding Control Allegations Against Stone Point

Plaintiffs identify multiple sources of Stone Point's influence over the transaction, and they also identify at least one unusual fact—the pay increase.  But no individual source of influence nor interesting fact, standing alone, is enough for the court to conclude that Stone Point exercised actual control.  And Plaintiffs failed to piece these allegations together to form a coherent theory of control under a holistic

[94] Pls.' Answering Br. at 57.

[95] Dkt. 76 ("Defs.' Reply Br.") at 20.

analysis. There is no basis for the court to infer that Stone Point has the power or influence sufficient to force a deal that the Special Committee or other directors did not want. Plaintiffs thus have failed to allege transaction-specific control. And because there is no reasonable inference that Stone Point determined the outcome of the sale process, there is no reasonable inference that Stone Point controlled the Company writ large. Plaintiffs do not adequately allege that Stone Point, standing alone, was a controller with concomitant fiduciary allegations.

### 2. Plaintiffs Fail To Plead A Control Group.

Plaintiffs also assert that Stone Point, acting with the Stone Point Directors and the Officer Directors comprised a control group. In *Sheldon v. Pinto*, the Delaware Supreme Court addressed the requirements for pleading a control group, adopting the "legally significant connection" standard:

> To demonstrate that a group of stockholders exercises control collectively, the [plaintiffs] must establish that they are connected in some legally significant way—such as by contract, common ownership, agreement, or other arrangement—to work together toward a shared goal. . . . [T]here must be some indication of an actual agreement, although it need not be formal or written.[96]

It is safe to infer that the Stone Point Directors acted in a group with Stone Point. Both are Senior Principals of the firm. Carey has been with Stone Point or its predecessor entities since 1997, and Muhtadie since 2003. But that does not give Stone Point any greater power or authority than it exercised without the Stone Point

---

[96] *Sheldon*, 220 A.3d at 251–52 (internal quotation marks omitted) (quoting *In re Crimson Expl. Inc. S'holder Litig.*, 2014 WL 5449419, at *15 (Del. Ch. Oct. 24, 2014)).

37

Directors. Thus, including these defendants within the alleged group does not help Plaintiffs. Plaintiffs appear to include the Stone Point Directors for the limited purpose of building a tie to the Officer Directors to group them with Stone Point.

In support of their argument for including the Officer Directors in a group, Plaintiffs contend that the Officer Directors and Stone Point had parallel interests in connection with the Merger[97] and formally memorialized their connection through the Interim Investors Agreement.[98] They also allege that the group members shared historical ties with each other.[99]

Plaintiffs' suite of allegations does not support the existence of a control group. Plaintiffs have pled that the Officer Directors had parallel interests, but group allegations look toward horizontal ties among group members. The concurrence of self-interest might explain why group members work together, but that concurrent interest alone is not enough to allege the existence of a group.[100]

---

[97] Pls.' Answering Br. at 41.

[98] *Id*. at 44–45.

[99] *Id*. at 41–43.

[100] *See, e.g.*, *Gilbert v. Perlman*, 2020 WL 2062285, at *6 (Del. Ch. Apr. 29, 2020) ("To demonstrate the existence of a control group, it is insufficient to identify a group of stockholders that merely shares parallel interests."); *Garfield v. BlackRock Mortg. Ventures, LLC*, 2019 WL 7168004, at *9 (Del. Ch. Dec. 20, 2019) (noting that "an array of plus factors" beyond a "mere concurrence of self-interest" could "allow[ ] the Court to infer some indication of an actual agreement" (internal quotation marks omitted) (quoting *Sheldon*, 220 A.3d at 252)); *In re Crimson*, 2014 WL 5449419, at *15 ("The law does not require a formal written agreement, but there must be some indication of an actual agreement. Plaintiffs must allege more than mere concurrence of self-interest among certain stockholders to state a claim based on the existence of a control group."); *Dubroff v. Wren Hldgs., LLC,* 2009 WL 1478697, at *3 (Del. Ch. May 22, 2009) ("[I]f all a complaint alleges is that a group of shareholders have 'parallel interests,' such allegations are insufficient as a matter of law to support the inference

The Interim Investors Agreement offers no help.  The Officer Directors were not parties to the Interim Investors Agreement; it was executed by affiliates of CD&R and Stone Point.  Plaintiffs rely on Schedule A to the Interim Investors Agreement, a term sheet for the partnership that would own the Company post-closing.  The term sheet provides that Stone Point would appoint five members of the post-Merger nine-member board, two of whom would be "the Company's CEO and another member of the Company's senior management who is a 'Permitted Holder' under [the Credit Agreement]."[101]  Schedule A does not refer expressly to the Officer Directors, but refers to members of Focus management generally.  In a conclusory fashion, Plaintiffs alleged, however, that "CD&R agreed to give Stone Point and the Officer [Directors] control of the private post-Merger Focus"[102] and "tied the Officer [Directors'] post-Merger board representation to the size of Stone Point's equity stake[.]"[103]  Plaintiffs provide no factual bases to support these inferences.[104]  It is not reasonably conceivable that the Interim Investors Agreement reflects an agreement among the Officer Directors, Stone Point, and the Stone Point Directors to act as a group.

---

that the shareholders were part of a control group." (quoting *Cox Commc'ns,* 2006 WL 1586375, at *6)).

[101] Pls.' Answering Br., Ex. 29 (Interim Investors Agreement) Schedule A at 1–2.

[102] Compl. ¶ 252.

[103] Pls.' Answering Br. at 44.

[104] *See infra* Part II.B.7 (finding that Plaintiffs failed to plead facts supporting an inference that the Officer Directors were motivated by the promise of post-close employment).

As to historical ties, Plaintiffs alleged that Stone Point was an anchor investor in Focus since its founding through the close of the Merger and that the Officer Directors served on the Board with Carey and Muhtadie from July 2018 through the close of the Merger.[105] These are relevant considerations, but they are not enough to infer a legally significant relationship. No Delaware decision has found that fitting the description of an "anchor" investor or having one's board nominee serving on a board with management suffices to group an investor with management absent some plus factor.

As a plus factor here, Plaintiffs allege that "Adolf, Carey, and Muhtadie were members of the exclusive Yellowstone Club."[106] This is a juicy fact. It does not extend to Kodialam. But one can reasonably infer that the three club members are friends.[107] Even so, this sort of friendship is weaker than the kinds of relationships from which this court has inferred the existence of a control group.[108]

---

[105] Compl. ¶¶ 21–23, 45.

[106] Pls. Answering Br. at 42.

[107] Of course, not all persons who spend vacations in homes in the same neighborhood are friends. In fact, sometimes neighborly relationships succeed due to a lack of contact. In the words of Robert Frost's *Mending Wall*, "good fences make good neighbors." Robert Frost, "Mending Wall," North of Boston (1914). But the court must draw plaintiff-friendly inferences at this stage.

[108] *In re Tilray, Inc. Reorg. Litig.*, 2021 WL 2199123, at *11 (Del. Ch. June 1, 2021) (finding plaintiffs adequately pled the existence of a control group where the members were "former classmates and long-time friends[,]" jointly managed different entities through management agreements, "held each other out as partners," defined themselves in their group entity charter as the "Founders," and "work[ed] on their various co-ventures just down the hall from each other") (internal quotation marks omitted)); *Garfield v. BlackRock Mortgage Ventures, LLC*, 2019 WL 7168004, at *9 (Del. Ch. Dec. 20, 2019) (finding plaintiffs adequately pled the existence of a control group where plaintiffs alleged the group members had "ten-year history of co-

Plaintiffs' argument for a control group becomes even less reasonable if one accepts Plaintiffs' position (for the sake of argument) that Stone Point is a controller all on its own. As this court held in *Almond v. Glenhill Advisors, LLC*, where a single member of an alleged control group is by itself a controller, a plaintiff must plead facts supporting an inference that the other members of the group are necessary to secure the desired outcome.[109] In *Glenhill*, plaintiffs alleged that the minority stockholder defendants formed a control group with another stockholder that had mathematical voting control.[110] The court rejected the theory, explaining that the plaintiff sought to "glom on to a preexisting controlling stockholder additional stockholders to give them the status of a control group."[111]

Plaintiff does not adequately allege that Stone Point needed the Officer Directors to achieve any desired outcome. Indeed, Plaintiffs argue the opposite, asserting that "even if [the court] was not inclined to find it reasonably conceivable that Stone Point and the [O]fficer [D]efendants acted as a group, the [c]ourt should find that Stone Point alone was a controller."[112] Thus, the Officer Directors are

---

investment" in the company, which they "decided to start . . . together as the Company's founding sponsors," and the company repeatedly used defined terms in public documents to interchangeably and collectively refer to the group members); *In re Hansen Medical, Inc. S'holders Litig.*, 2018 WL 3025525, at *7 (Del. Ch. June 18, 2018) (finding plaintiffs adequately pled the existence of a control group where the members shared a "twenty-one year coordinated investing history").

[109] 2018 WL 3954733, at *25 (Del. Ch. Aug. 17, 2018), *aff'd*, 224 A.3d 200 (Del. 2019); *see also Gilbert*, 2020 WL 2062285, at *6–10.

[110] 2018 WL 3954733, at *25.

[111] *Id*. at *26 (internal quotation marks omitted).

[112] Oral Arg. Tr. at 77:16–20; *see also* Pls.' Answering Br. at 46 ("Even if Plaintiffs had not adequately alleged that the Controller Defendants acted as a group (and they

41

merely glommed on to the party that Plaintiffs propose is the real controller—Stone Point. Pleading no facts suggesting that the Officer Directors' participation was necessary to achieve Stone Point's alleged ends, Plaintiffs have not successfully pled the existence of a control group including them.

## B. Counts II Through IV Against The Stone Point Directors And Officer Directors

Given the absence of a controller, and because Focus stockholders received cash for their shares, the Merger is presumptively subject to enhanced scrutiny.[113] Under *Corwin*, however, a defendant can lower the standard of review to the irrebuttable version of the business judgment rule if the merger "has been approved by a fully informed, uncoerced majority of the disinterested stockholders."[114] Where, as here, a merger subject to enhanced scrutiny has been approved by an uncoerced majority of the disinterested stockholders, a plaintiff bears the burden of pleading disclosure deficiencies sufficient to refute a *Corwin* defense.[115] A single well-pled disclosure deficiency will foreclose the application of *Corwin*.[116]

At the pleading stage, the operative question in assessing a *Corwin* vote is whether the complaint "supports a rational inference that material facts were not

---

have), that would not change the outcome. The facts alleged support an inference that Stone Point by itself had the ability to control the Company and, in fact, controlled the process leading to the Merger.").

[113] *Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 184 (Del. 1986).

[114] *Corwin v. KKR Fin. Hldgs. LLC*, 125 A.3d 304, 306 (Del. 2015).

[115] *In re Solera Hldgs., Inc. S'holder Litig.*, 2017 WL 57839, at *7–8 (Del. Ch. Jan. 5, 2017).

[116] *Van der Fluit v. Yates*, 2017 WL 5953514, at *8 n.115 (Del. Ch. Nov. 30, 2017).

42

disclosed or that the disclosed information was otherwise materially misleading."[117]

A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote."[118] Materiality does not demand "a substantial likelihood that [the] disclosure . . . would have caused the reasonable investor to change his vote."[119] Rather, the test is whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available."[120]

Plaintiffs argue that the Proxy Statement suffers eight different disclosure deficiencies.

### 1. WEG's Interest

Plaintiffs' strongest theory concerns disclosures relating to WEG. The Proxy Statement states that WEG (identified in the Proxy Statement as "Party I") made non-binding offers of up to $55 per share, which the Special Committee rejected in favor of CD&R's $53 per share offer.[121] The Proxy Statement disclosed that part of

---

[117] *Morrison v. Berry*, 191 A.3d 268, 282 (Del. 2018).

[118] *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del. 1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976)).

[119] *Id.*

[120] *Id.*

[121] Proxy Statement at 41 ("On January 17, 2023, Party I, along with its financial sponsors, submitted a preliminary and non-binding proposal to acquire the Company for $51.75 per share in cash."), 44 ("Also on January 22, 2023, Party I informed representatives of each of the Special Committee Financial Advisors that it was prepared to increase its offer price to $55.00 per share in cash but that this increased offer price would be preliminary and non-binding and would be subject to continued due diligence and Party I's receipt of the requisite financing."), 47 ("The Special

the Special Committee's rationale for agreeing to exclusivity with CD&R in late January 2023 was because WEG was comparatively behind in conducting due diligence and obtaining debt and equity financing. Defendants say this is enough, citing cases for the proposition that "Delaware law does not require disclosure of a play-by-play of negotiations leading to a transaction or of potential offers that a board has determined were not worth pursuing."[122]

Plaintiffs allege, however, that WEG was behind compared to CD&R because Defendants iced WEG out of the sale process. They allege that: (i) Goldman introduced Adolf to WEG's CEO on September 20, 2022, as a party potentially interested in buying Focus; (ii) WEG's CEO tried to schedule a meeting with Adolf during September and October 2022; and (iii) WEG's CEO and Adolf met for dinner on November 15, 2022, and WEG expressed interest in acquiring Focus during the meeting.[123] Plaintiffs also allege that Adolf did not disclose WEG's expression of interest until December 28, when the indication of interest first appears in the

---

Committee reviewed its rationale for having the Company enter into exclusivity, including that it believed that it had engaged in a rigorous process to achieve the best price reasonably available for all of the stockholders of the Company and that a Potential Transaction at a price per share of $53.00 in cash was, in the Special Committee's view, more likely to be consummated than a transaction with Party I at a preliminary price per share of $55.00 in cash[.]").

[122] *City of Miami Gen. Emps. v. Comstock*, 2016 WL 4464156, at *15 (Del. Ch. Aug. 24, 2016), *aff'd*, 158 A.3d 885 (Del. 2017).

[123] Compl. ¶¶ 112, 147.

minutes of any Special Committee or Board meeting.[124]  The Proxy Statement did not disclose any of these facts.

If true, a reasonable stockholder would consider these facts important, particularly given that Goldman repeatedly advised that strategic buyers like WEG would not have an interest in acquiring the Company.  Also, given that a disclosed rationale for agreeing to exclusivity with CD&R in late January 2023 was WEG's lesser progress in diligence, a reasonable stockholder would want to know if Defendants caused this disadvantage by declining to engage with WEG during the fall of 2022.

Defendants contend that Plaintiffs' theory is not true.  Defendants instead point the court to a letter from V&E to Plaintiffs' counsel regarding the settlement of Plaintiffs' action to enforce their demand to inspect documents under 8 *Del. C.* § 220 (the "V&E Letter").[125]  The V&E Letter states that "Mr. Adolf and Mr. Dekko met for dinner on November 15, 2022 . . . [w]ithin a week thereafter, Mr. Adolf orally informed both the Special Committee and Goldman Sachs of that dinner during ordinary-course communications."[126]

Essentially, Defendants ask the court to accept a factual statement made by its attorneys in a document produced through a Section 220 inspection as a basis for rejecting reasonable plaintiff-friendly inferences at the pleading stage.  They note

---

[124] Compl. ¶ 180 ("These facts are not disclosed in the Proxy and are wholly absent from any prior Board or Special Committee minutes.").

[125] Defs.' Opening Br. at 50.

[126] *Id.*, Ex. 16 at 2.

that the parties agreed to incorporate the Section 220 document into the pleadings by reference, and so it is fair for them to point to this document. But "[t]he incorporation-by-reference doctrine does not enable a court to weigh evidence on a motion to dismiss. It permits a court to review the actual documents to ensure that the plaintiff has not misrepresented their contents and that any inference the plaintiff seeks to have drawn is a reasonable one."[127]

"Where a defendant improperly and extensively uses Section 220 Documents in support of a Chancery Rule 12(b)(6) motion to support factual inferences that run counter to those supported in the complaint, the court may either exclude the extraneous matter from its consideration or convert the Chancery Rule 12(b)(6) motion into a motion for summary judgment so that the plaintiff may take discovery before the court determines if pre-trial dispositive relief is appropriate."[128]

The court declines to deny the motion outright. As discussed more below, Defendants' motion has done the work of significantly narrowing the well-pled allegations to a single disclosure issue. By introducing countervailing facts at the pleading stage, however, Defendants invite the court to convert their motions to dismiss into motions for summary judgment under Court of Chancery Rule 12(d). Rule 12(d) provides that, where a party "moves under Rule 12(b)(6) or 12(c) and presents matters outside the pleadings that are not excluded by the Court, then (1) the motion must be treated as one for summary judgment under Rule 56; and (2) all

---

[127] *Voigt*, 2020 WL 614999, at *9 (collecting cases).

[128] *In re CBS Corp. S'holder Class Action & Deriv. Litig.*, 2021 WL 268779, at *18 (Del. Ch. Jan. 27, 2021), *as corrected* (Feb. 4, 2021).

parties must be given a reasonable opportunity to present pertinent material under Rule 56."[129]

In this circumstance, it is appropriate to convert Defendants' motions to dismiss into motions for summary judgment for the limited purpose of addressing Plaintiffs' disclosure theory based on the WEG interactions.

### 2. Stone Point's Preferences

Plaintiffs next argue that the Proxy Statement should have disclosed that "Stone Point had conveyed that it was not agnostic with respect to potential partners in an acquisition of the Company and had expressed certain views on potential partners."[130]  That allegation does not support a disclosure claim.

The Proxy Statement informed stockholders that Stone Point might have preferences among bidders.  An attachment to Focus's 13e-3 filing disclosed Jefferies's advice that bids from other parties may "depend[] on Stone Point's willingness to

---

[129] Ct. Ch. R. 12(d); *see also Acero Capital, L.P. v. Swrve Mobile, Inc.*, 2021 WL 2207197, at *3 (Del. Ch. June 1, 2021) (converting Rule 12(b)(6) motion into motion for summary judgment because defendant relied on matters outside the pleadings); *Raj & Sonal Abhyanker Family Tr. ex rel. UpCounsel, Inc. v. Blake*, 2021 WL 2477025, at *9 (Del. Ch. June 17, 2021) (same); *Bedrock Techs., LLC v. Earthwater Tech. Int'l, Inc.*, 2006 WL 2521430, at *1 (Del. Ch. Aug. 24, 2006) (same); *Kessler v. Copeland*, 2005 WL 396358, at *4 (Del. Ch. Feb. 10, 2005) (same); *Peoples Sec. Life Ins. Co. v. Fletcher*, 1988 WL 26791, at *1 (Del. Ch. Mar. 16, 1988) (same); *Kramer v. W. Pac. Indus., Inc.*, 1987 WL 17043, at *1 (Del. Ch. Sept. 11, 1987), *aff'd*, 546 A.2d 348 (Del. 1988) (same); *Broadscale OC Invs., L.P. v. Clayton*, C.A. No. 2020-0262-PAF, Dkt. 30 at 78–81 (Del. Ch. Oct. 15, 2020) (TRANSCRIPT) (same); *Dawson v. Pittco Cap. P'rs, L.P.*, C.A. No. 3148-VCN, Dkt. 38 at 37 (Del. Ch. Dec. 7, 2007) (TRANSCRIPT) (same).

[130] Compl. ¶ 192.

partner with other sponsors[.]"[131] The Proxy Statement also disclosed that Stone Point informed the Special Committee that "a transaction with [WEG] would involve Stone Point conducting due diligence on and an evaluation of [WEG] if Stone Point were asked to roll over all or a portion of its equity[.]"[132] Although the Proxy Statement did not use the phrase "not agnostic," the information conveyed accurately informed stockholders of this disposition.

Plaintiffs rely on *Morrison v. Berry*,[133] but that case does not apply. There, the company disclosed that its founder was "willing to consider any equity rollover with a party other than Apollo[.]"[134] That was false, as internal emails revealed the opposite.[135] Plaintiffs can point to no false assertions here.

Plaintiffs fail to plead that these omissions would have materially altered the total mix of information.

### 3. Bankers' Advice

Plaintiffs argue that the Proxy Statement should have disclosed the following advice provided by the Special Committee's financial advisors:

> Goldman's advice that it was "not worthwhile" for the Special Committee to engage with [Party E] because Stone Point had already indicated that "it would not make an additional equity investment at a price per share above $51.50" and that Goldman informed the Special Committee that, because Stone Point wanted to "participat[e] on the

---

[131] Defs.' Opening Br., Ex. 19 at Ex. 99.(c)(8) at 28.

[132] Proxy Statement at 38.

[133] 191 A.3d 268 (Del. 2018).

[134] *Id.* at 281.

[135] *Id.* at 285–86.

> buyer side, it was disincentivized to support a higher price per share."[136]

And

> Jefferies' advice that, if Stone Point were not comfortable participating as a buyer, the Company likely would not have an actionable bid.[137]

As to Goldman's advice, the Proxy Statement disclosed that Party E indicated its offer would require that Stone Point purchase significant additional Focus equity, Stone Point expressed its lack of interest in purchasing such additional equity for more than $51.50 per share, and CD&R and WEG had offered $51.50 per share or more.[138] Goldman's conclusion that it was "not worthwhile" to further engage with Party E does not add much to this mix.[139]

As to Jefferies's advice, Plaintiffs appear to be characterizing a bullet point on a Jefferies slide deck, which states "[t]o get actionable bids, other parties will need to undertake diligence and potentially secure committed financing depending on Stone

---

[136] Pls.' Answering Br. at 68.

[137] *Id.*

[138] Proxy Statement at 38 ("Party E stated that it understood that Stone Point would need to be a part of the go-forward capital structure for the Company's debt to be portable under the Existing Credit Documents and indicated that it would expect Stone Point to make an additional investment in the pro forma company resulting from a potential acquisition by Party E."), 44 ("Stone Point indicated, however, that, based on the terms proposed as of such date, it was not willing to commit to a rollover of all of its equity interests in the Company in a Potential Transaction and a reinvestment in the pro forma company resulting from a Potential Transaction at a price per share higher than $51.50.").

[139] *Cinerama, Inc. v. Technicolor, Inc.*, 1991 WL 111134, at *24 (Del. Ch. June 24, 1991), *aff'd in part, rev'd in part on other grounds sub nom. Cede & Co. v. Technicolor, Inc.*, 634 A.2d 345 (Del. 1993) ("[C]onclusions that may be drawn from information disclosed need not be disclosed.").

Point's willingness to partner with other sponsors[.]"[140] That Jefferies presentation was disclosed it in its entirety as an attachment to the Company's 13e-3 filing. The Proxy Statement also told stockholders where they could find this information, stating: "Copies of [Jefferies's] written preliminary presentations and a copy of the Jefferies' presentation made to the Special Committee on February 26, 2023, have been filed as exhibits (c)(8) – (c)(10) to the Schedule 13e-3 filed with the SEC in connection with the proposed Mergers."[141] Plaintiffs fail to allege a disclosure violation with respect to Jefferies's advice.

### 4. Special Committee Compensation

Plaintiffs argue that the Proxy Statement should have disclosed the following facts concerning the Special Committee's compensation: (i) shortly before and during a break in the Special Committee meeting to recommend the Merger, the Stone Point Directors and management approved the Special Committee's increased compensation; (ii) all the Special Committee members except LeMieux approved the increased compensation, with LeMieux approving it minutes after the meeting; and (iii) the compensation of three of the four Special Committee members increased six-fold.[142]

The Proxy Statement disclosed that

> Prior to the Board meeting to consider the Special
> Committee's recommendation, the Board adopted, by
> unanimous written consent, resolutions providing for

---

[140] Defs.' Opening Br., Ex. 19 at 28.

[141] Proxy Statement at 83.

[142] Pls. Answering Br. at 69.

> additional compensation for the Special Committee members, in light of the work performed by the Special Committee and to be performed by the Special Committee during the go-shop period, that had exceeded the Company's expectations when it first determined to structure compensation for each Special Committee member's service on the Special Committee.[143]

Under a section titled "Special Committee Fees," the Proxy Statement disclosed the precise amounts of this compensation.[144] The Proxy Statement does not disclose that the increase was approved during a "break" in the Special Committee meeting and "fifteen minutes" before the Special Committee approved the Merger, but those details would not alter the total mix of information available.

Plaintiffs rely on *In re Tele-Communications, Inc. Shareholder Litigation*, but that case is distinguishable.[145] There, an allegedly conflicted director "recommended that [the special committee members considering a deal] be reasonably compensated for their efforts in connection with the transaction," with the amount to be determined after the committee gave its recommendation.[146] The committee then had "four meetings over a one-week period."[147] After the committee recommended the merger, the board approved $1 million in compensation to each committee member.[148] The proxy statement in *Tele-Communications* disclosed nothing about this additional

---

[143] Proxy Statement at 53.

[144] *Id*. at 99.

[145] 2005 WL 3642727 (Del. Ch. Dec. 21, 2005).

[146] *Id*. at *1, *4–5.

[147] *Id*. at *15 n.52.

[148] *Id*. at *3.

51

compensation.[149]  The court noted that "the uncertain, contingent, and potentially large nature of the payments, without any objective benchmarks or other measures, could have given [the committee] additional and undisclosed financial interests . . . that might have affected their judgments."[150]

The circumstances pled in *Tele-Communications* bear little resemblance to those alleged here.  The Proxy Statement disclosed the Special Committee's compensation, including the full amount that each member received in connection with their work on the Merger.  Additionally, the Special Committee's compensation was not "uncertain, contingent," or lacking "objective benchmarks"; it had specific base and monthly fees, which the Committee members would receive regardless of their recommendation.  For these reasons, Plaintiffs fail to allege that the information they believe was wrongfully withheld would materially alter the total mix of information about the nature of the Special Committee's compensation increases.

### 5.    Jefferies's Fee Increase

Plaintiffs argue that the Proxy Statement should have disclosed that the Special Committee increased Jefferies's discretionary fee by $7 million on the same day Jefferies presented its fairness opinion to the Special Committee.[151]

The Proxy Statement disclosed Jefferies's modified fee arrangement and that the Special Committee approved this fee modification on the day it received Jefferies's

---

[149] *Id.* at *4.

[150] *Id.* at *5.

[151] Pls.' Answering Br. at 70–72.

fairness opinion.[152]  The Proxy Statement also explains that Jefferies's compensation package comprised "up to $4.5 million" in base compensation plus "a discretionary fee of up to $8.0 million."[153]

Given what was disclosed, other information Plaintiffs point to is not likely to alter the total mix of information.[154]

### 6.    Special Committee Independence

Plaintiffs assert the Proxy Statement "failed to disclose a number of facts that undermine the disinterestedness and independence of members of the Special Committee."[155]  These facts relate to Adolf's personal relationships with committee members, which Plaintiffs claim Stone Point "exploit[ed]" to its benefit and certain alleged "associations" LeMieux had with CD&R.[156]  As to the connections between Adolf and the committee members, Plaintiffs contend the Proxy Statement failed to disclose:

- Morganroth and LeMieux both self-reported that they were friends with Adolf;

- Adolf, LeMieux, and Neuhoff have overlapping social club memberships; and

---

[152] Proxy Statement at 53.

[153] *Id*. at 83–84.

[154] *In re Paramount Gold & Silver Corp. S'holders Litig.*, 2017 WL 1372659, at *13 (Del. Ch. Apr. 13, 2017) (finding registration statement disclosure regarding advisor's fee sufficient where it "disclosed the total amount and the contingent nature of [the advisor's] compensation in connection with the merger" and "stockholders were made aware of the full magnitude and nature of [the advisor's] financial interest in the transaction").

[155] Compl. ¶ 277.

[156] Pls. Answering Br. at 72.

- Morganroth and Adolf have neighboring vacation homes at the Yellowstone Club. [157]

The Proxy Statement did not disclose this information. Defendants argue that the Proxy Statement need not disclose this level of detail, because "[a]llegations of mere personal friendship or a mere outside business relationship, standing alone, are insufficient to raise a reasonable doubt about a director's independence."[158]

Plaintiffs rely on *In re Orchard Enterprises, Inc., Inc. Stockholder Litigation*, where the relationships and the conflicts were much more pronounced.[159] There, the chair of the special committee had "long-standing ties" to the family that owned the controller, including being "business associates and personal friends for approximately twenty years" and "invest[ing] together in fifteen different companies."[160] Here, there are no long-standing business ties, but social-circle issues that tend not to alarm Delaware courts.[161] Plus, there is no controller nor any well-pled allegations that those relationships tainted the process.

---

[157] Compl. ¶ 277.

[158] *Beam ex rel. Martha Stewart Living Omnimedia, Inc. v. Stewart*, 845 A.2d 1040, 1050 (Del. 2004) (affirming finding that plaintiff failed to adequately plead director interestedness where directors moved in the same social circles, attended the same weddings, developed business relationships before joining the board, and described each other as "friends").

[159] Pls.' Answering Br. at 72.

[160] *In re Orchard Enters., Inc. S'holder Litig.*, 88 A.3d 1, 9 (Del. Ch. 2014).

[161] *See, e.g.*, *Zimmerman v. Crothall*, 2012 WL 707238, at *13 (Del. Ch. Mar. 5, 2012), *as revised* (Mar. 27, 2012) (finding that allegations that two directors "were good friends, that their families socialized, and that the two had worked closely together on previous occasions, including in founding a start-up company" to be "allegations of mere friendship and shared work experiences" and determining the directors to be "disinterested and independent").

As to LeMieux's ties to CD&R, the only connection Plaintiffs appear to raise is that LeMieux self-reported on a director questionnaire that he is the Chairman of a law firm that "represents CD&R in immigration matters."[162] Plaintiffs plead no other facts alleging that this relationship affected any part of the sale process. Nor does the Complaint suggest that the firm's representation of CD&R resulted in fees that would be material to LeMieux. Indeed, the Complaint hesitates to assert the firm received compensation from CD&R at all, noting only that it "likely obtains fees."[163] Plaintiffs fail to plead this is a fact that would be germane, yet alone material, to stockholders when considering whether to approve the Merger.

The information to which Plaintiffs point is not material as a matter of law.

### 7. CD&R's Indication Of Interest

Plaintiffs argue that the Proxy Statement should have included more information concerning CD&R's offer and discussed its unique benefits for Stone Point, the Stone Point Directors, and the Officer Directors.[164] Specifically, Plaintiffs argue that the Proxy Statement should have disclosed that: (i) CD&R expected a material rollover from management; (ii) CD&R stated it would be an "outstanding partner" to management; and (iii) CD&R insisted on Stone Point's equity rollover.[165]

---

[162] Compl. ¶¶ 38, 277.

[163] *Id.* ¶ 277.

[164] *Id.* ¶ 280.

[165] Pls.' Answering Br. at 74.

Plaintiffs pull the statement regarding management's equity rollover verbatim from a deck attached to Focus's Schedule 13e-3 filing.[166] That information is, therefore, publicly disclosed.

Plaintiffs draw the "outstanding partner" statement from CD&R's September 14, 2022 proposal stating that it would be "an outstanding partner for the management team as it works to increase the long-term value of the Company."[167] That was puffery and not material.[168]

Plaintiffs base their last subpoint on the minutes from a November 10, 2022 Board meeting. The minutes state that Goldman discussed that "CD&R would require a partner or partners in connection with a transaction . . . [and] the potential

---

[166] Defs.' Opening Br., Ex. 24 at Exhibit 99.(c)(1) at 5.

[167] Compl. ¶ 281.

[168] *See, e.g., Teamsters Local 677 Health Servs. & Ins. Plan v. Martell*, 2023 WL 1370852, at \*18 (Del. Ch. Jan. 31, 2023) (rejecting claim that proxy statement failed to include information regarding promises of post-close employment for target management where plaintiff "base[d] its theory on a closing-date announcement and the idea that financial buyers retain management" and did not "allege facts suggesting that employment discussions with [the acquirors] occurred during the sale process"); *English v. Narang*, 2019 WL 1300855, at \*13 (Del. Ch. Mar. 20, 2019), *aff'd*, 222 A.3d 581 (Del. 2019), and *aff'd*, 222 A.3d 581 (Del. 2019) (dismissing claim that Recommendation Statement omitted material facts concerning post-close employment for target management where plaintiffs pled that the acquiror "routinely retains" existing management but did not allege any facts concerning the "timing and extent of any discussions between [the target and buyer] regarding post-close employment"); *see also City of Warren Gen. Empls.' Ret. Sys. v. Roche*, 2020 WL 7023896, at \*13 (Del. Ch. Nov. 30, 2020) (finding plaintiff failed to plead that management was conflicted due to prospect of post-transaction employment where the complaint "seize[d] on complimentary statements in . . . indications of interest" from buyers, including that the buyers were "100% supportive of the management team," and "very enthusiastic about the opportunity to partner with [the target]" and did not allege that "any employment offers were extended or that employment discussions were had").

impact that Stone Point's participation may have on CD&R's indication of interest."[169] To note the obvious, the minutes only state that CD&R would require "a partner" to close a deal, not that the partner would have to be Stone Point. Setting that aside, it is hard to view this omission as material given what was disclosed. The Proxy Statement already disclosed the following:

- "Having Stone Point be a part of the go-forward capital structure could allow [Focus's] debt to be portable," which would "potentially permit[] CD&R to submit a higher price per share offer";[170]

- Goldman approached Stone Point on November 9 about "rolling over some or all of its equity interests in [Focus] or making an additional equity investment";[171]

- CD&R expressed a willingness to increase its offer "in the event that Stone Point was willing to roll over its equity interests";[172]

- CD&R explored "discussions with other potential sources of equity financing even if Stone Point was willing to so participate";[173] and

- The parties ultimately agreed that Stone Point would rollover a portion of its equity interest.[174]

These disclosures convey the correlation between the amount of equity Stone Point would commit to rolling over and CD&R's ability and willingness to engage in a deal. Plaintiffs fail to plead that more was required to avoid a materially misleading disclosure.

---

[169] Pls.' Answering Br. at 73–74 (quoting Pls.' Answering Br., Ex. 4 at 3).

[170] Proxy Statement at 27.

[171] *Id.* at 28.

[172] *Id.* at 45–46.

[173] *Id.* at 46.

[174] *Id.* at 99.

### 8. Effect Of Maintaining The Credit Agreement

Plaintiffs argue that the Proxy Statement should have disclosed that "keeping the existing financing in place, which required Stone Point's consent, would allow a potential purchaser to avoid refinancing costs in the range of $3.00–$4.00 per share."[175] Plaintiffs also allege that the Proxy Statement should have disclosed that Stone Point was among the "Permitted Holders" under the Credit Agreement, and that giving Stone Point the right to designate a majority of the post-closing board was a way to keep the Credit Agreement in place.

The disclosure of the additional $3–$4 per share detail would not alter the total mix of information in a material way. The Proxy Statement also detailed how Stone Point's involvement through the Credit Agreement might allow CD&R to increase its bid from $45 to $50 to $51.50 to $53 per share.[176] Given those disclosures, the $3–$4 range is "additional granularity" that would be "cumulative to the information already disclosed."[177]

No further disclosures about the "Permitted Holders" are warranted. The Proxy Statement refences the potential portability of the Credit Agreement several times,[178] including that making Focus's debt portable could allow bidders "to submit

---

[175] Pls.' Answering Br. at 76.

[176] *See* Proxy Statement at 45–46 ("CD&R conveyed . . . that [it] might be able to meet the Special Committee's proposed price of $53.00 . . . [if] Stone Point was willing to roll over its equity interests[.]").

[177] *Dent v. Ramtron Int'l Corp.,* 2014 WL 2931180, at *12 (Del. Ch. June 30, 2014).

[178] Compl. ¶ 285 (citing Proxy Statement at 28, 30, 35–36, 38–39).

a higher price per share."[179] The Proxy Statement discloses that after the Merger, the "Permitted Holders (as defined in the Existing Credit Document)" will "indirectly own a majority of the Voting Stock of the Company and Focus LLC [and] be entitled to designate a majority of the members of the [post-close] board[.]"[180] Exhibits to the Company's Schedule 13e-3 "defined 'Permitted Holders' to include 'Stone Point' and 'Focus management.'"[181]

Plaintiffs fail to adequately plead that the Proxy Statement fails to disclose that Stone Point and members of Management were Permitted Holders, and that such information would significantly alter the total mix of information made available to stockholders.

## III.  CONCLUSION

The motion to dismiss Count I is granted; Plaintiffs have failed to adequately allege the existence of a controller or control group.  But for one well-pled disclosure violation, Defendants would be entitled to dismissal of Counts II through IV under *Corwin*.  Counts V through VII for aiding and abetting would fail for lack of a valid predicate.  Given the dispositive nature of Plaintiffs' one viable disclosure issue on the outcome of Defendants' motions, the court is converting the motions to dismiss into motions for summary judgment to explore the factual bases for this limited issue.

---

[179] Proxy Statement at 28.

[180] *Id*. at 120.

[181] Defs.' Opening Br., Ex. 25 at Ex. 99.(c)(3) at 47, Ex. 99.(c)(4) at 48.

The motions to dismiss Counts V through VII are stayed pending resolution of summary judgment briefing.